# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕱𝖊𝖉𝖊𝖗𝖆𝖑 𝕮𝖑𝖆𝖎𝖒𝖘

**Bid Protest**
**No. 15-354C**
**Filed Under Seal:  July 21, 2015**
**Reissued for Publication:  August 10, 2015***

|  |  |  |
|---|---|---|
| VION CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Post-Award Bid Protest; Tucker Act; 28 |
| | ) | U.S.C. § 1491(b); RCFC 52.1; Federal |
| THE UNITED STATES, | ) | Acquisition Regulation (FAR); Price |
| | ) | Realism Analysis; Organizational Conflict |
| Defendant, | ) | of Interest; Supplementation of the |
| | ) | Administrative Record. |
| and | ) | |
| | ) | |
| WORLD WIDE TECHNOLOGY, INC. | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

*David R. Hazelton*, Counsel of Record, *Kyle R. Jefcoat*, Of Counsel, *Anne W. Robinson*, Of Counsel, *Dean W. Baxtresser*, Of Counsel, Latham & Watkins, LLP, Washington, D.C., for plaintiff.

*Veronica N. Onyema*, Trial Attorney, *Deborah A. Bynum*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Benjamin C. Mizer*, Principle Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C., *Joann W. Melesky*, Of Counsel, *Daniel C. McCintosh*, Of Counsel, Defense Information Systems Agency, Scott Air Force Base, Illinois, for defendant.

*William M. Weisberg*, McLean, Virginia, for defendant-intervenor.

---

* This Memorandum Opinion and Order was originally filed under seal July 21, 2015 (docket entry 50), pursuant to the protective order entered in this action on April 9, 2015 (docket entry 10).  The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the protective order.  The parties filed a joint status report on August 10, 2015 (docket entry 52) stating that they agreed there is no need for redactions.  Accordingly, the Court is reissuing its Memorandum Opinion and Order as originally filed.

**MEMORANDUM OPINION AND ORDER**

GRIGGSBY, Judge

## I.    INTRODUCTION

This post-award bid protest challenges the decision of the Defense Information Systems Agency ("DISA") to award Solicitation No. HC1028-13-R-0015, for information technology storage infrastructure services, to World Wide Technology, Inc. ("WWT"). Plaintiff, ViON Corporation ("ViON"), challenges the agency's award decision on four grounds: First, ViON alleges that DISA did not appropriately evaluate the technical merits of WWT's proposal. Second, ViON alleges that the agency failed to conduct a price realism analysis of WWT's proposal. Third, ViON alleges that WWT's proposal improperly took exception to several material terms of the solicitation. Lastly, ViON contends that DISA failed to investigate a potential organizational conflict of interest involving WWT.

The matter is before the Court on the parties' cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). For the reasons discussed below, the administrative record shows that the agency's award decision was reasonable and in accordance with the terms of the solicitation and applicable law. And so, the Court (1) **DENIES** plaintiff's motion for judgment on the administrative record; (2) **GRANTS** defendant's motion for judgment on the administrative record; and (3) **GRANTS** defendant-intervenor's motion for judgment on the administrative record. Because supplementation of the extensive administrative record with the expert declaration proffered by plaintiff is not necessary for meaningful judicial review of this matter, the Court also **DENIES** plaintiff's motion to supplement the administrative record.

## II.   PROCEEDURAL AND FACTUAL BACKGROUND[1]

### A.    Factual Background

The government has filed an extensive administrative record in this case and the relevant facts are not in dispute. On December 19, 2014, DISA awarded solicitation No. HC1028-13-R-

---

[1] The facts recited in this Memorandum Opinion and Order are taken from the administrative record ("AR at __"); plaintiff's complaint (Compl. at __"); plaintiff's motion for judgment on the administrative record ("Pl. Mot. at __"); plaintiff's memorandum in support of its motion for

0015, for the Enterprise Storages Services II ("ESS II") contract, to WWT.  AR at 17; 346-87. ViON is the incumbent contractor under a predecessor contract, known as the Enterprise Storage Services I contract.  Compl. at 5.

In this bid protest action, ViON alleges that DISA failed to properly evaluate WWT's proposal for the ESS II contract and, as a result, the agency's award decision was arbitrary, capricious and not in accordance with law.  *See generally*, Pl. Mem.  As relief, ViON requests, among other things, that the Court set aside the agency's award decision; direct DISA to reevaluate the proposals submitted by WWT and ViON; and issue a declaratory judgment that the agency's award decision was arbitrary, capricious, and contrary to law.  Pl. Mot. at 1-2.

1.    **DISA's Request For Proposals**

On September 19, 2013, DISA issued a request for proposals ("RFP") for the ESS II contract.  AR at 69-150.  The ESS II contract is a single, fixed-price, indefinite-delivery/indefinite-quantity contract, for four years with two one-year options for renewal.  AR at 74; 140.

DISA analyzed several factors in evaluating the proposals that it received in response to the RFP.  Specifically, the RFP requires that the contract award be based upon a best-value tradeoff, considering the following three factors, listed in descending order of importance: technical/management; past performance; and cost/price.  AR at 141.  The technical/management factor is comprised of three equally-weighted subfactors: technical solution; service delivery; and proof of concept.[2]  *Id.*

For the technical solution subfactor, the RFP requires that each proposal support "heterogeneous data migration" and "3-way replication of data".  AR at 3265-66.  For the service delivery subfactor, the RFP requires that the agency "evaluate the soundness of the [o]fferor's approach for ensuring the proposed solution meets the functional and performance requirements

---

judgment on the administrative record ("Pl. Mem. at __"); and defendant's cross-motion for judgment on the administrative record (Def. Mot. at __").  Except where otherwise noted, the facts cited herein are undisputed.

[2] The RFP requires that in evaluating the proposals DISA assign each subfactor a "technical/management ratings" of either good, acceptable, marginal or unacceptable and a "technical/management risk ratings" of low, moderate, or high.  AR at 141-44.

[of the RFP]."  AR at 143.  In addition, the RFP requires that DISA evaluate "[t]he flexibility of the [o]fferor's approach to address overall call order management, new technology, future changes in requirements and technology refresh; periodic operational proof of performance testing; cost savings over the period of the contract and other features advantageous to meeting the Government's storage service requirements."  *Id.*

For the proof of concept subfactor, the RFP requires that "[i]f a Proof of Concept Demonstration is required ALL Offerors in competitive range will be required to demonstrate their proposed technical/management solution . . . ."  *Id.*  In this regard, the RFP provides that:

> The Proof of Concept Demonstration will test all five (5) supported environments referenced in Task 3, 6.3.1 of the [performance of work statement].  If a Proof of Concept Demonstration is required, a detailed test plan, together with any Government provided data required to be used in the demonstration, will be provided to each Offeror 14 calendar days prior to the demonstration.

*Id.*; *see also* AR at 3269.

With respect to price, the RFP also provides that DISA "may reject any proposal that is evaluated to be . . . unreasonably high or low in price when compared to the Government estimates, such that the proposal is deemed to reflect an inherent lack of competence or failure to comprehend the complexity and risks of the program."  AR at 140.  The RFP further provides that DISA may use "one or more of the techniques in FAR 15.404" to evaluate price.  AR at 149.

DISA received seven competitive proposals in response to the RFP, including proposals from WWT and ViON.  AR at 308-2329; 18,202.

## 2.     Evaluation Of WWT's Proposal

On November 19, 2013, WWT submitted its initial proposal for the ESS II contract.  AR at 2047.  The proposal states that storage services would be provided by two devices:  the HP XP7 storage array for the "mainframe" component and the HP PAR 7400 storage array for the "open system" storage component.  AR at 5806; 13,732.  The proposal also states that HP is a "major subcontractor" for WWT.  AR at 13,713.

### a.     First Evaluation

DISA evaluated WWT's proposal on four occasions.  During the initial evaluation, DISA assigned WWT's proposal a technical/management rating of "unacceptable," because the

4

proposal did not meet the requirements in the RFP for storage capabilities, redundant array of independent disks, data re-duplication and required technical capabilities.  AR at 2977.  The agency also rated the proposal "moderate" for technical/management risk.  AR at 2977-78.   In connection with this initial evaluation, DISA issued 30 evaluation notices to WWT regarding the proposal.  AR at 3055-137.  These notices specifically requested information about how the proposal would satisfy the technical requirements of the RFP, and particularly, how the proposed HP 3PAR 7400 storage solution would meet the requirement for enterprise class storage.  AR at 3097.

### b.      Second Evaluation

After reviewing DISA's evaluation notices, WWT submitted a revised proposal on April 24, 2014.  AR at 5763-6320.  In that proposal, WWT replaced its HP 3PAR 7400 solution with the HP 3PAR 10000 series, to satisfy the technical requirements of the RFP.  AR at 5806. Unfortunately for WWT, its second proposal did not resolve all of DISA's concerns and the agency continued to question whether WWT's proposal could meet the requirements of the RFP. AR at 6621-77.  To address these remaining concerns, DISA issued another round of evaluation notices to WWT.  AR at 6700-6759.

### c.      Third Evaluation

Once again, WWT revised its proposal to address DISA's concerns.  AR at 8601-9068. In its revised proposal, WWT assured DISA that its proposed solution would exceed the RFP's requirement for heterogeneous data migration and 3-way replication of data.  AR at 16,497. Specifically, WWT stated that its solution exceeded the requirement for heterogeneous data migration, because its "AutoLUN feature is used to transparently migrate data between different tiers of storage non-disruptively, whether native to the array or externally connected virtualized heterogeneous storage."  *Id*.  Furthermore, WWT stated that its solution exceeded the requirement for 3-way replication of data because it "is capable of 4-way replication."  *Id*.

The agency conducted proof of concept testing for WWT's revised proposal on July 22-23, 2014.  AR at 9096; 9094-112.   WWT successfully completed this testing and received a "pass" rating.  AR at 17,358; 9101-08.  Because DISA found that the cost would be unreasonably high, the agency did not test data migration during proof of concept testing.  AR at 18,355.

After proof of concept testing, the agency issued another round of evaluation notices to WWT.  AR at 9161-79.  In response to DISA's evaluation notices, WWT revised its proposal for the third time on August 18, 2014.  AR at 11,138-548.

####         d.        Final Evaluation

Following yet another round of evaluation notices, WWT submitted its final proposal to the agency on November 6, 2014.  AR at 14,260-73; 16,472-829.  After reviewing WWT's final proposal, DISA issued a final consensus report.  AR at 17,439-79.  For the technical solution subfactor, DISA assigned WWT's proposal a technical/management rating of "acceptable" and a technical/management risk rating of "low."  AR at 17,439-79.  Specifically, the agency's final consensus report found that WWT's final proposal:

> [met the] 99.999% availability requirement specified in [the performance work statement] Section 6.5.1 by providing the HP XP7 and the HP 3PAR 10000 as the enterprise class storage solution.  The HP hardware meets all the enterprise class capabilities requirements detailed in [the performance work statement] Section 6.1.1.1 to ensure that the 99.999% availability requirement detailed in [the performance work statement] Section 6.5.1 can be met.

AR at 17,441.  With regards to the service delivery subfactor, DISA found that WWT's proposal "met all the stated service delivery requirements" in the RFP.  AR at 17,358.  In particular, the agency found that the proposal addressed the RFP's requirements regarding new technology.  AR at 17,450.

With respect to the proof of concept evaluation subfactor, the agency found that WWT successfully completed all 25 proofs of concept tests.  AR at 17,452-58.  The agency also assigned the proposal a "substantial confidence" rating for the past performance evaluation factor under the RFP.  AR at 17,458.

Lastly, with respect to the cost/price evaluation factor, DISA found that WWT's pricing was consistent with the technical representations in the proposal.  AR at 17,473.  "In accordance with FAR 15.404, reasonableness of the offeror's price was established based on adequate price competition."  AR at 17,472.  The agency also noted in its final consensus report that WWT's proposed price was "well below" the Independent Government Cost Estimate for the ESS II contract, but that differences in the methodology for evaluation in the RFP precluded a

comparison between WWT's price and the Independent Government Cost Estimate.  AR at 17,474.

### 3.      Award Of The ESS II Contract

Following the evaluation process, DISA's source selection evaluation groups recommended that the agency award the ESS II contract to WWT.  AR at 18,311.  In addition, DISA's Source Selection Authority conducted an "integral assessment" of all competitive proposals which found that:

> With WWT's overall cost being 13% to 265% lower than any other offeror's proposed cost, in my assessment, there are more benefits to the Government in the proposal from WWT than from [any other competitive range offeror]. . . . The additional evaluated strengths of the ViON and EMC proposals absolutely do not justify the additional costs to the Government if award were to be made to either of those two offerors.

AR at 17,386.  In reaching this conclusion, the source selection authority noted that WWT's proposed price was the lowest offer, and that each offeror's price had been "driven by its specific hardware configuration and overall technical solution proposed to meet the requirements of the performance work statement."  AR at 17,379.  Based upon these findings, the agency determined that WWT's proposal represented the best value to the government.  AR at 17,387.  DISA subsequently awarded the ESS II contract to WWT on December 17, 2014.  AR at 17,346-87.

### 4.      Alleged Organizational Conflict Of Interest

During its protest of the award of the ESS II contract before the Government Accountability Office ("GAO"), ViON raised, for the first time, an alleged potential organizational conflict of interest involving WWT and another DISA contractor–the Evaluator Group.  AR at 17,556-605.  Specifically, ViON alleges that WWT's subcontractor, HP, has a financial relationship with the Evaluator Group that could give rise to an organizational conflict of interest regarding the evaluation of WWT's proposal.  Pl. Mem. at 19.

The Evaluator Group has provided consulting services to DISA since at least 2009.  AR at 18,754-55.  On August 8-9, 2014, a cofounder and senior strategist of the Evaluator Group, Randy Kearns, made a presentation on storage trends and technology at DISA.  AR at 18,757; 18,175.

7

Mr. Kearns and the Evaluator Group had no involvement in the evaluation of proposals for the ESS II contract.  AR at 18,174.  During a briefing held on December 15, 2014, DISA stated that, at that time, the agency found "[n]o known potential conflicts of interest" involving the solicitation of the ESS II contract.  AR at 19,937.  Because it does not believe an organizational conflict of interest exists, DISA has not conducted an investigation or review into any organizational conflicts of interest involving Mr. Kearns or the Evaluator Group.  AR at 18,842.

**B.       Procedural Background**

Following the award of the ESS II contact to WWT, ViON and another disappointed bidder, EMC Corporation, filed GAO protests challenging DISA's award decision.  AR at 17,556-605; AR at 18,047-143.  The GAO denied both protests on April 3, 2015.  AR at 19,076-87.

On April 8, 2015, ViON filed a complaint in this Court challenging DISA's award decision.  *See generally* Compl.  On April 9, 2015, following an initial status conference, the Court granted WWT's oral motion to intervene in this matter and entered a protective order.  *See generally* Order Granting Mot. for Protective Order; Order Granting Defendant-Intervenor's Oral Mot. to Intervene.  On April 17, 2015, defendant filed the administrative record, which has been subsequently corrected by defendant three times; on April 24, 2015, May 13, 2015, and May 15, 2015, respectively.  *See generally* Administrative Record.

On May 11, 2015, plaintiff filed a motion to supplement the administrative record with the expert declaration of Mr. Claus Mikkelsen ("Mikkelsen Declaration").  *See generally* Pl. Mot. to Supp.  On May 15, 2015, plaintiff filed a motion for judgment on the administrative record.  *See generally* Pl. Mot.  On May 29, 2015, defendant and defendant-intervenor separately filed cross-motions for judgment on the administrative record, which also included oppositions to plaintiff's motion to supplement the administrative record.  *See generally* Def. Mot.; Def.-Intervenor Mot.

On June 5, 2015, plaintiff filed its reply in support of its motion for judgment on the administrative record and its response to defendant and defendant-intervenor's cross-motions.  *See generally* Pl. Reply.  On June 12, 2015, defendant and defendant-intervenor each filed a

reply brief in support of their motions for judgment on the administrative record.  *See generally* Def. Reply; Def.-Intervenor Reply.

On June 17, 2015, plaintiff filed a motion to partially strike defendant's reply in support of its motion for judgment on the administrative record or, in the alternative, for leave to file a sur-reply.  *See generally* Pl. Mot. to Strike.  On June 22, 2015, the Court denied plaintiff's motion to strike, and granted the motion to file a sur-reply.  *See generally* Order Granting in Part and Denying in Part Pl. Mot. to Strike; Pl. Sur-reply.  The Court held oral argument on the parties' cross motions for judgment on the administrative record and plaintiff's motion to supplement the administrative record on June 25, 2015.  *See generally* Oral Arg. Tr.

## III.    JURISDICTION AND LEGAL STANDARDS

### A.    Jurisdiction And Bid Protests

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2012).  In bid protest cases, this Court reviews agency actions under the "arbitrary and capricious" standard.  *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of review set forth in the Administrative Procedure Act).  And so, under the Administrative Procedure Act standard, an award may be set aside if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  The United States Court of Appeals for the Federal Circuit has explained that:

> When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a "heavy burden" of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Id.* at 1351 (citations omitted).

In reviewing an agency's procurement decision, the Court should recognize that the agency's decision is entitled to a "presumption of regularity," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) (citations omitted), and the Court should not substitute its judgment for that of the agency. *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997). The protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law or procedure. *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) ("*ITAC*"); *see also Bannum, Inc. v. United States*, 60 Fed. Cl. 718, 723 (2004); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 648 (2003). This standard "is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

In addition, as long as there is "a reasonable basis for the agency's action, the Court should stay its hand even though it might, as an original proposition, have reached a different conclusion . . . ." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). But, if "the agency entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency," then the resulting action lacks a rational basis and, therefore, is defined as "arbitrary and capricious." *Ala. Aircraft Indus., Inc.–Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted).

### B.    Judgment On The Administrative Record

Generally, Rule 52.1 limits this Court's review of an agency's procurement decision to the administrative record. RCFC 52.1; *see Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) ("[T]he focal point for judicial review should be the administrative record already in existence."). And so, unlike a summary judgment motion brought pursuant to Rule 56, the existence of genuine issues of material fact does not preclude judgment on the administrative record under Rule 52.1. *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242

(2011); RCFC 56.  Rather, the Court's inquiry is whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006).

In addition, under its bid protest jurisdiction, the Court "may award any relief [it] considers proper, including declaratory and injunctive relief . . . ."  28 U.S.C. § 1491(b)(2); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  In considering whether to issue a permanent injunction, the Court looks to (1) whether plaintiff will succeed on the merits; (2) whether plaintiff will suffer irreparable harm in the absence of injunctive relief; (3) whether the balance of hardships to the parties favors granting injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  To prevail, plaintiff must show an entitlement to injunctive relief by clear and convincing evidence.  *CSE Constr. Co., Inc. v. United States*, 58 Fed. Cl. 230, 261 (2003).

### C.    Supplementing The Administrative Record

The United States Court of Appeals for the Federal Circuit held in *Axiom Resource Management*, that the "parties' ability to supplement the administrative record is limited" and that the administrative record should only be supplemented "if the existing record is insufficient to permit meaningful review consistent with the APA."  564 F.3d at 1379-81; *see also Caddell Constr. Co., Inc. v. United States*, 111 Fed. Cl. 49, 93 (2013).  In *Axiom*, the Federal Circuit cited to the Supreme Court's decision in *Camp v. Pitts*, which stated that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  564 F.3d at 1379 (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  This focus is maintained in order to prevent courts from using new evidence to "convert the arbitrary and capricious standard into effectively de novo review."  *L-3 Commc'ns EOTech, Inc. v. United States*, 87 Fed. Cl. 656, 671 (2009) (citations omitted).

This Court has interpreted the Federal Circuit's directive in *Axiom* to mean that supplementation of the administrative record is permitted to correct mistakes and fill gaps, but is not permitted when the documents proffered are unnecessary for an effective review of the government's procurement decision.  *L-3 Commc'ns EOTech*, 87 Fed. Cl. at 672.  And so, this

Court has precluded supplementation of the administrative record with declarations that contain "post-hoc contentions of fact and argument." *Id.*

## IV.   ANALYSIS

ViON challenges DISA's award decision on four grounds.  First, ViON argues that DISA improperly evaluated WWT's proposal, in violation of the express terms of the RFP and applicable law.  Pl. Mem. at 21-25.  Second, ViON contends that DISA failed to conduct a proper price realism analysis of WWT's proposed price, as required by the RFP.  Pl. Mem. at 25-30.  Third, ViON contends that DISA failed to enforce the RFP's prohibition on "assumptions and exceptions" in its evaluation of WWT's proposal.  Pl. Mem. at 30-34.  Lastly, ViON argues that DISA failed to conduct a proper investigation into a possible organizational conflict of interest.  Pl. Mem. at 34-36.

The government and WWT maintain that the administrative record shows that DISA appropriately evaluated WWT's proposal and that the agency's award decision was reasonable and in accordance with law.  For the reasons discussed below, the Court agrees.

### A.     Supplementation Of The Administrative Record Is Not Warranted

As an initial matter, the Court must deny ViON's request to supplement the extensive administrative record in this case, because the declaration proffered by ViON addresses the legal issues before the Court in this bid protest matter.  *See generally* Pl. Mot. to Supp.  On April 17, 2015, the government submitted an extensive administrative record in this case, consisting of more than 20,000 pages.  *See generally* Administrative Record.  Since that initial filing, the government has subsequently corrected the record on three separate occasions to ensure that the administrative record is complete and contains the information required under Appendix C of the Court's Rules.  *Id.*; RCFC Appendix C.

Nonetheless, ViON seeks to supplement the administrative record in this case with the declaration of its expert, Claus Mikkelsen.  *See generally* Pl. Mot. to Supp.  In support of its motion to supplement, ViON argues that "given the highly technical nature of this procurement, and of the parties' arguments in this bid protest, an expert's testimony is necessary for effective judicial review by this Court."  Pl. Mot. to Supp. at 1.

The government and WWT oppose ViON's request.  *See generally* Def. Resp. to Mot. to Supp.; Def.-Intervenor Resp. to Mot. to Supp.  In particular, the government maintains that such a supplementation would be improper, because the Mikkelsen Declaration "constitutes a piece of advocacy that reaches the legal conclusions ViON has posited in its protest."  Def. Resp. to Mot. to Supp. at 51.  The Court must agree.

In this case, the declaration proffered by ViON fails to meet the limited circumstances where supplementation of the administrative record would be appropriate.  This Court permits parties to supplement the administrative record if such supplementation is meaningful to judicial review, but prohibits supplementation when it seeks to address the legal issues before the Court. *L-3 Commc'ns EOTech*, 87 Fed. Cl. at 672 (denying supplementation of the administrative record because plaintiff's proffered declaration "directly addresses the dispute before the court–whether the government's decision to eliminate [the protester] from this competition . . . was arbitrary or capricious"); *see also InGenesis, Inc. v. United States*, 104 Fed. Cl. 43, 49 (2012) (denying supplementation of the administrative record with a declaration of the prospective contractor's president, which sought to attack the agency's decision, and reasoning that additional evidence was not necessary for the Court to conduct its very limited review); *RhinoCorps Ltd. Co. v. United States*, 87 Fed. Cl. 261, 282 (2009) (denying supplementation with a declaration and affidavit because they "proffer facts that substitute plaintiff's opinion for the [agency's] technical determinations").

Here, the Mikkelsen Declaration analyzes the technical merits of WWT's proposal and concludes that the proposal does not meet the requirements of the RFP.  Mikkelsen Decl. at ¶ 4 ("[M]y review and analysis of the AR demonstrates that WWT's proposal does not meet the RFP's express 'Enterprise storage' requirements."); Mikkelsen Decl. at ¶¶ 7-8 ("I can testify with confidence that the 3PAR satisfies neither the [heterogeneous data migration] nor [3-way replication of data] requirements set forth in the RFP."); Mikkelsen Decl. at ¶¶ 20-38 (arguing that WWT's 3PAR Solution does not meet the performance work statement's requirements for "3 way replication of data" and "heterogeneous data migration"); Mikkelsen Decl. at ¶¶ 39-44 (arguing that DISA failed to consider deficiencies in WWT's proposal).  The Mikkelsen Declaration does not correct any mistakes or fill any gaps in the extensive administrative record before the Court.  Rather, the declaration reiterates ViON's legal position in this case–that WWT's proposal is technically deficient.  In addition, ViON acknowledges that this declaration

was not part of the record before DISA at the time the agency made its award decision.  Pl. Mot. to Supp. at 5.

Given this, allowing ViON to supplement the administrative record with the Mikkelsen Declaration would run afoul of the Federal Circuit's clear directive in *Axiom*—that this Court should not supplement the administrative record unless the omission of the information "precludes effective judicial review." *Axiom Res. Mgmt.*, 564 F.3d at 1380.  While the Mikkelsen Declaration does provide a useful summary of ViON's legal position in this case, it is not needed for the Court to effectively review this bid protest matter.  And so, ViON's motion to supplement the administrative record is denied.

### B.     The Record Shows That DISA's Award Decision Was Reasonable And In Accordance With Law

The extensive administrative record shows that DISA's decision to award the ESS II contract to WWT was reasonable and in accordance with the requirements of the RFP and applicable law.  This Court reviews the agency's award decision under the arbitrary and capricious standard and affords DISA a presumption of regularity.  *See* 28 U.S.C. § 1491(b)(4); *Citizens to Pres. Overton Park*, 401 U.S. at 415; *Cincom Sys., Inc.*, 37 Fed. Cl. at 672.  In this regard, the Court does not substitute its judgment for that of DISA.  *Cincom Sys., Inc.*, 37 Fed. Cl. at 672.  Rather, the Court examines the administrative record to determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." *Banknote*, 365 F.3d at 1351 (citations omitted).

ViON maintains in this bid protest action that DISA did not adequately evaluate WWT's proposal and, that as a result, WWT cannot successfully perform the ESS II contract.  Pl. Mem. at 10, 22.  Specifically, ViON contends that the agency failed to: (1) properly evaluate WWT's proposed technical solution; (2) conduct a price realism analysis of WWT's proposal; (3) find that WWT's proposal took exception to several material terms of the RFP; and (4) conduct an investigation into a potential organizational conflict of interest in involving WWT.  The administrative record shows, however, that DISA carefully reviewed WWT's proposal by conducting numerous evaluations, issuing 70 evaluation notices, and conducting two days of proof of concept testing.  AR at 17,440; 9094-112; 11,138-56.  The administrative record also

shows that the agency's evaluation of WWT's proposal complied with the requirements of the RFP, the Federal Acquisition Regulation, and applicable law. And so, for the reasons discussed below, the Court must reject ViON's challenge to the agency's award decision.

### 1.      DISA Properly Evaluated WWT's Proposed Technical Solution

The administrative record shows that DISA conducted an appropriate technical evaluation of WWT's proposal. ViON challenges DISA's technical evaluation of WWT's proposal on two grounds: First, ViON argues that DISA should have found that WWT's 3PAR solution for enterprise storage could not perform heterogeneous data migration[3] and 3-way replication of data.[4] Pl. Mem. at 8; *see also* AR at 3264-65. Second, ViON argues that the agency violated the RFP when it did not conduct proof of concept testing to ensure that WWT's proposed technical solution could perform heterogeneous data migration. *Id.* For the reasons discussed below, ViON's arguments are not supported by the evidence in the administrative record.

#### a.      DISA Reasonably Concluded That WWT's Technical Solution Could Perform Heterogeneous Data Migration And 3-Way Replication Of Data

The administrative record shows that DISA carefully evaluated WWT's technical solution and that the agency reasonably concluded WWT's proposal complied with the technical requirements of the RFP after WWT revised its proposal. In its initial proposal, WWT proposed the HP 3PAR 7400 for its open systems solution. AR at 2071. DISA assigned this proposal a technical/management rating of "unacceptable" and a technical/management risk rating of "moderate." AR at 2977-78. DISA also issued an initial round of 17 evaluation notices, which related to WWT's proposed technical solution. AR at 3055-137. In response, WWT revised its proposal and replaced the HP 3PAR 7400 solution with the HP 3PAR 10000 solution. AR at

---

[3] ViON refers to this as "non-disruptive data migration" ("NDDM"). Pl. Mem. at 6-7. But the government does not accept this terminology, noting that the term is not in the performance work statement. Def. Mot. at 28.

[4] ViON refers to this as "three datacenter replication" ("3DC"). Pl. Mem. at 6. But, the government does not accept this terminology, noting that the term is not in the performance work statement. Def. Mot. at 29.

5806.  WWT also represented that this "update will serve to meet the requirements defined in Task 1 for enterprise class storage . . . ."  *Id.*

In response to WWT's revised proposal, DISA conducted a second evaluation of the technical merits of the proposal.  AR at 6621-77.  During its second evaluation, DISA carefully examined how WWT's updated 3PAR solution met the requirements of the RFP.  AR at 6647; 6653.  The second evaluation also prompted DISA to issue a second round of evaluation notices, including eight evaluation notices that specifically related to WWT's proposed technical solution.  AR at 6700-759.  Once again, WWT revised its proposal.  AR at 8601-9068.

The administrative record also shows that DISA tested WWT's proposal to ensure compliance with the technical requirements of the RFP.  AR at 9094-112.  Following the second evaluation, DISA conducted proof of concept testing, in order for WWT "to demonstrate [that its] proposed technical/management solution" met the RFP's requirements.  AR at 9096.  WWT successfully completed all 25 proof of concept tests, ten of which specifically tested WWT's proposed technical solution.  *See* AR at 17,452-55; *see also* AR at 142; 3265-66.  Following the proof of concept testing, DISA also issued a third round of evaluation notices, which included five evaluation notices related specifically to WWT's proposed technical solution.  AR at 9161-79.

WWT revised its proposal for a fourth time and submitted a written response to the evaluation notices.  AR at 11,138-548.  WWT's final proposal also included a detailed chart that listed each requirement for the technical solution in the RFP and explained how its proposed solution met or exceeded those requirements.  AR at 16,497-98.  Specifically relevant here, WWT's final proposal stated that the proposed technical solution "exceeds" the requirement in section 6.1.1.1 of the performance work statement to "[s]upport 3-way replication of data" because it is capable of 4-way replication.  AR at 16,497.[5]  Furthermore, the final proposal also provided that WWT's technical solution met the requirement for "heterogeneous data migration" because "[t]he AutoLUN feature is used to transparently migrate data between different tiers of

---

[5] ViON alleges that this assertion by WWT applies only to its XP7 solution, not its 3PAR solution, because HP makes a similar statement about 4-way replication that references only the XP7.  Pl. Mem. at 8; AR at 14,563.  But, nothing in HP's proposal or WWT's proposal states that 3PAR solution could not meet the requirements of the RFP.  AR at 14,563-55.

16

storage non-disruptively, whether native to the array or externally connected virtualized heterogeneous storage." AR at 16,497.

After reviewing WWT's final proposal, DISA determined that WWT's final proposal met the "enterprise class capabilit[y] requirements in [performance work statement section] 6.1.1.1." AR at 17,441. The agency's final consensus report also noted that this conclusion was based upon a thorough analysis of WWT's proposal, the 30 separate evaluation notices DISA issued relating to the proposed technical solution, and a three-hour telephone conference with WWT. AR at 17,440.[6] Furthermore, in explaining its decision to award the ESS II contract to WWT, DISA noted that "[t]he WWT solution met all the stated Technical Solution requirements of the [performance work statement]. WWT provides HP's 3PAR 10000 series and HP's XP7 storage hardware to meet the stated storage solution requirements for Enterprise class storage." AR at 17,358 (DISA's Source Selection Document).

Given the extensive and well-documented review of WWT's proposal, the examination of the administrative record in this case reveals that DISA carefully evaluated the technical merits of WWT's proposal and that there was a rational basis for the agency's conclusion that the proposed technical solution met the requirements of the RFP.

### b.      The RFP Did Not Require Testing For Data Migration

The administrative record also shows that DISA was not required to include data migration as part of its proof of concept testing. Pl. Mem. at 11. In fact, a plain reading of the relevant portions of the RFP shows that testing for data migration is not a requirement for the solicitation.

---

[6] The final consensus report found that each of the 30 evaluation notices were "resolved to the Agency's satisfaction." AR at 17,440. In particular, the final consensus report noted the initial "uncertainty" by DISA evaluators about whether WWT's 3PAR solution individually met the requirements in section 6.1.1.1 for enterprise class storage. *Id*. The final consensus report notes, however, that WWT addressed this uncertainty by replacing the HP 3PAR 7400 with the HP 3PAR 10000 solution, which served to "clarif[y] their solution and satisfied the Government's requirement." *Id*. The final consensus report further indicates that WWT's proposal met the requirement for data migration strategy because its proposal "provid[ed] details on how the offeror will perform the migration from the existing DISA storage infrastructure to the offeror's solution." *Id*.

Specifically, the RFP provides in relevant part that, if DISA elects to conduct proof of concept testing, the proof of concept testing will:

> [T]est all five (5) supported environments referenced in Task 3, 6.3.1 of the [performance work statement].  If a Proof of Concept Demonstration is required, a detailed test plan, together with any government provided data required to be used in the demonstration, will be provided to each Offeror 14 calendar days prior to the demonstration.

AR at 3230 (performance work statement section 4.2.2).  Data migration is not one of the five tasks listed in section 6.3.1 of the performance work statement.  AR at 3269.  And so, this particular kind of testing is not required by the RFP.  *Id.*[7]

In addition, ViON's challenge of the agency's proof of concept test plan is also untimely. This Court has long recognized that an offeror wishing to challenge the terms of a solicitation must do so before the close of the bidding process.  *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (holding that a protester who knew the agency's interpretation of a solicitation but failed to challenge it before bids were due, waived its ability to object afterwards).  Here, the administrative record shows that ViON received the proof of concept testing plan for this solicitation on June 26, 2014, and that data migration testing is not mentioned in that plan.  AR at 9069-89.  To the extent that ViON believes the RFP called for data migration testing, it should have raised this concern prior to its own proof of concept testing, which occurred in July 2014.[8]  4 C.F.R. § 21.2(a)(2) (2015); *see also Micro-Research*, B-

---

[7] The list in Task 3, section 6.3.1 of the performance work statement provides as follows: "6.3.1.1 IBM System z (IBM z/OS, IBM z/VM, Red Hat Enterprise Linux, SUSE Linux Enterprise Server); 6.3.1.2 X-86 (Windows Server, Red Hat Enterprise Linux, SUSE Linux Enterprise Server, Solaris, Vmware vSphere Enterprise Plus); 6.3.1.3 Itanium (HP-UX); 6.3.1.4 SPARC (Solaris); 6.3.1.5 IBM System p (AIX); 6.3.1.6 Any other operating system software that DISA may require in the future."  AR at 3269.

[8] ViON argues that it had not been put on notice about the scope of the proof of concept testing, because ViON could have received a different test plan than WWT or other offerors.  Pl. Reply at 13.  But, the government made clear during oral argument that all offerors received the same test plan.  *See* Oral Arg. Tr. at 65.  Furthermore, as the government notes in its briefs, conducting different proof of concept tests for different offerors would have constituted disparate treatment of the offerors, which is not permitted in government procurements.  *See Sentrillion Corp. v. United States*, 114 Fed. Cl. 557, 568 (2014) ("It is well established that the agency must treat all offerors equally and consistently apply evaluation factors.").

220778, 1986 WL 63012, at *1 (Comp. Gen. Jan. 3, 1986) (finding that a "[p]rotest against [a] known requirement to be imposed in a benchmark test is untimely when not filed with the agency until after the date of the benchmark").

### 2.    DISA Properly Evaluated WWT's Proposed Price And Conducted A Price Realism Analysis

ViON's attempt to set aside DISA's award decision because the agency failed to conduct a price realism analysis is equally misguided.  Pl. Mem. at 25.  ViON raises three arguments challenging DISA's evaluation of the price component of WWT's proposal: (1) a price realism analysis is required by the RFP; (2) DISA failed to conduct and document any price realism analysis; and (3) DISA failed to compare WWT's price to the Independent Government Cost Estimate, as required by the RFP.  *Id*. at 26.  The Court addresses each of these arguments in turn.

As an initial matter, ViON correctly argues that the RFP requires a price realism analysis. *Id*. at 25-28.  The Federal Acquisition Regulation ("FAR") requires that, before awarding a fixed-priced contract, an agency must determine whether the price offered is fair and reasonable. FAR 15.402(a) (2015).  However, the FAR does not mandate that the agency conduct a price realism analysis.  *Id*.; *see FCN, Inc. v. United States*, 115 Fed. Cl. 335, 374 (2014) ("[W]ith a fixed-price contract, such as the one awarded pursuant to the Solicitation at issue, 'an agency may, but is not required to consider whether the offered price is realistic.'" (citations omitted)); *Mil–Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 541 (2013) ("[A]n agency 'may' perform price realism analyses 'on competitive fixed-price-type contracts.'" (quoting FAR 15.404–1(d)(3))).  Nonetheless, this Court has held that when the RFP provides that "unrealistically low offers 'may be considered unacceptable and rejected on that basis,'" a price realism analysis has been contemplated and must be conducted.  *FCN, Inc.*, 115 Fed. Cl. at 376 (citing *Linc Gov't Servs., LLC v. United States*, 108 Fed. Cl. 473, 500 (2012); *Logistics 2020, Inc.*, *B–408543*, 2013 WL 6235560, at *6 (Comp. Gen. Nov. 6, 2013) ("Given the solicitation's express statement that proposals would be evaluated to determine if prices were unrealistically high or low, we see no basis for any conclusion other than that the agency committed itself to a review of price realism." (internal quotations omitted)); *see also Flight Safety Servs. Corp.*, B-403831, B-403831.2, 2010 WL 5241433 at *2 (Comp. Gen. Dec. 9, 2010) (requiring a price

realism analysis when the RFP stated that the "Government may reject any proposal evaluated to be . . . unreasonably high or low in cost when compared to Government estimates").

In this case, the RFP expressly provides that "[t]he Government *may* reject any proposal that is . . . unreasonably high or low in price when compared to Government estimates, such that the proposal is deemed to reflect an inherent lack of competence of failure to comprehend the complexity and risks of the program."  AR at 140 (emphasis added).  The RFP further requires that each "offeror's cost/price proposal *will* be evaluated, using one or more of the techniques defined in FAR 15.404, in order to determine if it is reasonable and complete."  AR at 149 (emphasis added).  As this Court has previously recognized, such language commits the agency to conducting a price realism analysis.  *FCN, Inc.*, 115 Fed. Cl. at 376.  And so, ViON correctly maintains that the RFP required a price realism analysis in this case.

The administrative record shows, however, that DISA conducted a reasonable price realism analysis of WWT's proposal.  Pl. Mem. at 12-15.  In this regard, the FAR "does not mandate any particular approach" to conducting a price reasonableness analysis.  *Pemco Aeroplex, Inc.*, B-310372.3, 2008 WL 2684841, at *5 (Comp. Gen. June 13, 2008).  Rather, the FAR simply directs that:

> Normally, competition establishes price reasonableness.  Therefore, when contracting on a firm-fixed-price or fixed-price with economic price adjustment basis, comparison of the proposed prices will usually satisfy the requirement to perform a price analysis, and a cost analysis need not be performed. . . . The contracting officer shall document the cost or price evaluation.

FAR 15.305(a)(1) (2015).  And so, the Court need only look to whether the agency acted reasonably and in a manner consistent with the RFP's requirements.  *D & S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 33 (2011), *aff'd*, 484 F. App'x 558 (Fed. Cir. 2012).

In this regard, this Court has held that, when the agency elects to conduct a price realism analysis, "[t]he nature and extent" of that assessment are "matters within the agency's discretion."  *Int'l Outsourcing Servs. v. United States*, 69 Fed. Cl. 40, 48 (2005) (internal quotation marks and citation omitted); *Mil–Mar Century Corp.*, 111 Fed. Cl. at 541 ("[U]nless the agency commits itself to a particular methodology in a solicitation . . . the nature and extent of a price realism analysis, as well as an assessment of potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion." (citations omitted)).

20

And so, the Court grants the agency broad discretion in conducting the analysis. *Ceres Envtl. Servs., Inc. v. United States*, 97 Fed. Cl. 277, 303 (2011); *see also Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1351 (Fed. Cir. 2013) ("Agencies are entitled to a high degree of deference when faced with challenges to procurement decisions.").

In this case, the administrative record shows that DISA performed and documented a price realism analysis of WWT's proposal. Specifically, DISA issued 26 evaluation notices to WWT regarding price, which DISA noted WWT responded to and "resolved" to the agency's satisfaction. AR at 17,473-77;[9] *see Acad. Facilities Mgmt.*, 87 Fed. Cl. 441, 468 (2009) (noting that the agency "handled pricing realism in an appropriate manner" when it "was concerned with price variances, which it brought to the offerors' attention during discussions, and 'was satisfied with the responses it received . . . .'" (citations omitted)); *Info. Scis*, 73 Fed. Cl. 70, 102 (2006) (denying a challenge to a price realism analysis because the agency had provided a "cogent explanation" concerning a low price). DISA also found that WWT's proposed price was "complete," "calculated in accordance with Attachment J-3 Cost Model of the RFP," and that "all solicitation requirements were priced for all contract periods (base, option, and extension periods), figures were accurate and correctly calculated, and prices were presented in the Government-provided pricing scenario." AR at 17,472. In addition, DISA specifically assessed the "reasonableness" of WWT's price, stating that "[i]n accordance with FAR 15.404, reasonableness of the offeror's price was established based on adequate price competition." *Id.* And so, the agency reasonably concluded that WWT "addressed all Government uncertainties and its cost/price proposal is consistent with the work to be performed based on its technical approach." AR at 17,473.

In addition, DISA's Source Selection Authority reiterated that "[i]n accordance with FAR 15.404, reasonableness of the offerors' prices was established based on adequate price

_____

[9] This Court has held that the agency may make "use of questions to offerors as follow-up verification by which to satisfactorily perform a price realism analysis." *FCN, Inc.*, 115 Fed. Cl. at 379 (citing *Elec. Hardware Corp.*, 2005 WL 3681971, at *4 (Comp. Gen. Jan. 28, 2005)); *see also Raytheon Co. v. United States*, No. 15-077C, 2015 WL 3473683, at *5-7 (Fed. Cl. May 11, 2015) (examining the Air Force's use of evaluation notices to verify offerors' price proposals as part of an analysis on price reasonableness and realism); *Patriot Taxiway Indus. v. United States*, 98 Fed. Cl. 575, 587 (2011) (holding that use of evaluation notices to verify the accuracy of pricing offered by an offeror in a fixed-price contract satisfied the price reasonableness analysis).

competition." AR at 17,379.  The Source Selection Authority also concluded that "WWT's cost is significantly less than ViON and EMC which provides a best-value solution to the Government." AR at 17,387.  In making the contract award to WWT, DISA also noted that "[t]he offerors' pricing was driven by its specific hardware configuration and overall technical solution proposed to meet the requirements of the performance work statement." AR at 17,379 (DISA's Source Selection Decision Document).  And so, the administrative record reveals that DISA reasonably determined that WWT's proposal did not reveal "unbalanced pricing" and that WWT's price was reasonable.  AR at 19,938-39.

Lastly, ViON incorrectly argues that DISA failed to compare WWT's price to the Independent Government Cost Estimate.  Pl. Mem. at 28.  This Court has held that an agency is bound to a particular price realism technique when "the agency commits itself to a particular methodology in a solicitation."  *Afghan Am. Army Servs.*, 90 Fed. Cl. at 358.  Here, the RFP requires that DISA evaluate WWT's proposed price using one of the techniques set forth in FAR 15.404 and also provides that the agency *may* reject the proposal after comparison of the proposed price with the Independent Government Cost Estimate.[10]  The administrative record shows that DISA reviewed the Independent Government Cost Estimate for the purpose of comparing this estimate to WWT's total evaluated price.  AR at 17,474.  The administrative record further shows that DISA ultimately concluded that the Independent Government Cost Estimate was an inapt tool for analyzing the proposed price, because the estimate was developed using different methodologies than provided for in the RFP.  *Id.*  And so, the agency concluded

---

[10] The RFP provides that the "offeror's cost/price proposal will be evaluated, using one or more of the techniques defined in FAR 15.404, in order to determine if it is reasonable and complete." AR at 149.  The RFP further provides that the "Government may reject any proposal that is evaluated to be unreasonable in terms of program commitments, contract terms and conditions, or unreasonably high or low in price when compared to Government estimates . . . ." AR at 140.  Furthermore, because a comparison of the offeror's cost/price with the Independent Government Cost Estimate is one of the techniques listed in FAR 15.404, a comparison of WWT's price with the government cost estimate would satisfy both requirements of the RFP.  AR at 149; 140.

that "while [WWT's] proposed prices are lower than the Government's estimate, the offeror's proposed prices are reasonable." *Id.*[11]

When a price comparison reveals that the government's estimate has been based upon an alternate methodology, this Court has held that it is reasonable for the government to disregard the Independent Government Cost Estimate. *Westech Int'l.*, 79 Fed. Cl. at 286. The administrative record shows that is the case here. AR at 17,474. And so, DISA did not act arbitrarily in concluding that the Independent Government Cost Estimate was not a useful tool for analyzing WWT's proposed price in this case. *Cohen Fin. Servs., Inc. v. United States*, 112 Fed. Cl. 153, 167 (2013) ("The proposals' prices were based on different assumptions than the [Independent Government Cost Estimate], against which they were to be compared. . . . The Panel thus acted reasonably when it determined that its comparison of the proposals' prices with the [Independent Government Cost Estimate] did not support a conclusion that any of the prices were unrealistic.").

While plaintiff's burden for overcoming the deference afforded to an agency in conducting a price realism analysis is not insurmountable, a finding by the Court that the agency's price realism analysis lacked a rational basis is generally reserved for instances where the agency made "irrational assumptions or crucial miscalculations." *FCN, Inc.*, 115 Fed. Cl. at 376 (quoting *Mil–Mar Century Corp.*, 111 Fed. Cl. at 541 (internal quotations omitted)). The administrative record here shows that DISA's price realism analysis was reasonable. And so, ViON's challenge of the agency's price realism analysis must fail. *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 286 (2007) ("In order to overturn the agency's cost realism determination, plaintiff must establish that the [agency's] decision lacked a rational basis.").

---

[11] DISA's final consensus report specifically addressed the requirements of FAR 15.404 stating that "[i]n accordance with FAR 15.404, reasonableness of the offeror's price was established based on adequate price competition." AR at 17,472.

### 3.   DISA Properly Determined That WWT's Proposal Complies With The RFP

ViON's claim that WWT's proposal does not comply with the terms of the RFP is similarly without merit.  To the contrary, the administrative record shows that DISA properly found that WWT's proposal complies with the material terms of the RFP.

Under the FAR, agencies are bound by the terms of the solicitation in making contract awards.  *See* FAR 15.305(a).  Where a proposal fails to conform to a material term of the solicitation, the proposal is unacceptable and may not be the basis of an award.  *Centech Grp.*, 554 F.3d at 1037-38; *see also E.W. Bliss Co.*, 77 F.3d at 448; *Metro. Van & Storage, Inc. v. United States*, 92 Fed. Cl. 232, 260 (2010) ("[A]n agency's determination that a proposal is acceptable may be deemed arbitrary and capricious if the proposal did not provide what was called for in the solicitation.").  "A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the bid." *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 505 (2009).  And so, an agency's contract award is arbitrary and capricious if the awarded proposal was nonconforming with the solicitation.  *See Metro. Van & Storage*, 92 Fed. Cl. at 246-47.

Here, ViON contends that WWT's proposal did not comply with three terms of the RFP: namely, (1) the requirements involving delivery, billing, and ordering; (2) the requirement for technological advances in the products offered; and (3) the requirement that the ESS II contract is an indefinite-delivery/indefinite-quantity contract.  For the reasons discussed below, ViON's contentions are belied by the facts contained in the administrative record.

### a.   WWT's Proposal Complies With The RFP's Delivery, Billing, And Ordering Requirements

First, ViON incorrectly argues that WWT took exception to the RFP's delivery, billing, and pricing terms.  Pl. Mem. at 16-17.  In particular, ViON argues that the statement in WWT's proposal that orders will depart within 30 days, does not comply with the RFP's requirement to deliver, install, and configure hardware within 30 days.  Pl. Reply at 21; AR at 3281.  In this regard, section 6.9.2 of the performance work statement requires that "[d]elivery, installation and make ready for use of equipment must occur within 30 calendar days of the acceptance of the order by the Contractor."  AR at 3281.  WWT's proposal provides in relevant part that the "call

order process is to respond to DISA by next business day (NBD) with order validation" and further provides that "orders will depart the continental US within 30 days by commercial carrier." AR at 16,616. A plain reading of this language shows that WWT's proposal does not take exception to the 30-day delivery requirement in the RFP. Rather, the language affirms that shipments will occur within 30 days, as required by the RFP. AR at 16,616. And so, ViON fails to show that WWT's proposal takes exception to the RFP's delivery requirements.

The administrative record also shows that WWT did not take exception to the RFP's billing terms. The RFP requires that:

> The acceptance of equipment by the Government will start the billing cycle for this service. The contractor will work with DISA to develop an acceptance testing methodology to smoothly transition equipment into the DISA production environment. The official acceptance documentation will be provided by the Government after the contract award.

AR at 3276 (Performance Work Statement at § 6.11.3). The relevant part of WWT's proposal provides that:

> WWT agrees that acceptance by DISA will start the billing cycle, except when acceptance has been delayed for 30 days or more after delivery of equipment through no fault of WWT. In this case, billing shall commence on the 30th day after equipment delivery regardless of acceptance.

AR at 16,616. ViON argues that this language allows WWT to bill before acceptance in violation of the RFP. But, the RFP expressly allows for an acceptance testing methodology to be developed after the award of the contract. AR at 3276.[12] And so, the administrative record shows that WWT's proposal also complies with the billing terms in the RFP.

In addition, the administrative record makes clear that WWT's proposal did not take exception to the RFP's ordering requirements. Under section 6.11.1.4 of the performance work statement, "[t]he offeror has one business day to validate a call order for accuracy. Once the

---

[12] WWT's proposal is similar to ViON's proposal, which also provides that the parties would finalize the acceptance terms post-award. *See* AR at 17,053 ("Once DISA has issued a Call Order to ViON, if ViON is delayed in achieving the agreed-upon 'Ready-for-Use' standard by actions or inactions of DISA, ViON will submit its 'Ready-for-Use' billing notification for DISA's acknowledgement even though final 'Ready-for-Use' may not have actually occurred due to delays beyond ViON's control.").

offeror validates a call order for accuracy, the hardware should be delivered within 30 days or less." AR at 3276.  As discussed above, WWT's proposal states that its "call order process is to respond to DISA by next business day (NBD) with order validation" and the proposal further notes that "[w]ithin 5 business days we will provide an estimated delivery date, or the reason that the call order cannot be processed." AR at 16,616.  While ViON argues this language would allow WWT to reject orders after five days, in violation of the performance work statement, the text of WWT's proposal does not indicate that the contractor will fail to validate orders by the next business day.  Pl. Reply at 21-22; *see* AR at 16,616.  Rather, the proposal simply indicates that WWT will contact DISA if an order cannot be processed.  AR at 16,616.  And so, again ViON fails to demonstrate WWT's proposal takes exception to the ordering requirements in the RFP.

Lastly, ViON also incorrectly argues that WWT's inclusion of a "Minimum Storage TB" chart in its proposal imposes minimum order requirements on DISA, in violation of the RFP.  Pl. Reply at 4.  In this regard, the RFP incorporates FAR 52.216-19, which sets forth limits on minimum and maximum orders.  AR at 90.  In particular, the RFP provides that the agency is not obligated to purchase supplies or services that are less than $100.  *Id*.  A plain reading of the chart included in WWT's proposal makes clear that this chart does not require DISA to place minimum orders.  AR at 16,616.  Rather, the chart simply provides the minimum storage amounts that "should be considered." *Id*.  And so, ViON has fails to show that WWT's proposal takes exception to the minimum order requirements in the RFP.

### b.    WWT's Proposal Complies With the Requirement For Technological Advances

The administrative record also clearly shows that WWT's proposal complies with the technological advances requirement in the RFP.  Specifically, section 5.9 of the performance work statement provides that:

> The intent of this contract is to cover both present and future requirements for storage solutions.  As technology performance and capabilities improve, the class of storage will support any advances in improvement to performance or capabilities at the awarded SLIN price.

AR at 3265.  Section 6.11.6.2.1 of the performance work statement further provides that:

> When an Original Equipment Manufacturer (OEM) makes generally available for sale a newer technology listed in Performance Requirements sections 6.1 – 6.2, the offeror will make this technology available to the government on this contract within 6 months. When technology advances, the Government will make the final determination on when the SLIN configurations will be updated.

AR at 3277-78.

In this regard, WWT's proposal states that "[s]hould [WWT's current proposed] products reach [Original Equipment Manufacturer] designated end-of-life, be replaced by newer technology, use higher capacity/same form factor HDDs, or become unavailable for whatever reason, WWT will provide *functionally equivalent products* at or below the proposed price in the base period year for the initial proposed make/model product." AR at 16,617 (emphasis added). ViON maintains that the reference to "functionally equivalent products" in WWT's proposal contradicts the RFP's requirement to "support any advances in improvement to performance or capabilities." Pl. Reply at 22-23. Furthermore, ViON contends that WWT's offer of an unspecified brand of "functionally equivalent products" means that WWT will not necessarily provide new technology from an original equipment manufacturer, as required by the RFP. *Id*. ViON's contentions are without merit.

WWT's proposal clearly states that the contractor is committed to providing new technology. *See, e.g.*, AR at 13,729 ("Our service modeling methodology is continuously updated through WWT's Advanced Technology Center (ATC) lab procedures. We evaluate and test [Original Equipment Manufacturer] products and develop and design configuration and implementation tasks that support efficient, low-risk deployments."); AR at 13,798 ("WWT is committed to introducing new technology to DISA. Our new storage technology test strategy is to, quarterly[,] provide DISA a briefing of the upcoming [Original Equipment Manufacturer] release schedules."). Furthermore, in evaluating WWT's proposal DISA determined that WWT's proposal:

> [M]eets the requirement of Subfactor 2: Service Delivery (2.2) by providing quarterly briefings to DISA regarding [Original Equipment Manufacturer] updates and information on new technologies. The proposed solution to address new technology, future changes in requirements and technology refresh, as well as periodic operational proof of performance testing meets all requirements detailed in [performance work statement] Section 6.9.6. The offeror has proposed using either DISA facilities or their Advanced Technology Center (ATC) for the purpose of testing new technology.

27

AR at 17,450.  Because ViON fails to cite to any portion of WWT's proposal that provides that WWT will utilize equipment that has not been provided by an original equipment manufacturer, ViON fails to show that WWT's proposal takes exception to the technological advances requirement in the RFP.

> **c.    WWT's Proposal Also Complies With The RFP's Requirement That The Contract Will Be An Indefinite-Delivery/Indefinite-Quantity Contract**

Finally, ViON erroneously argues that WWT's proposal violates the indefinite-delivery/indefinite-quantity term in the RFP.  Pl. Mem. at 18-19.  The relevant portion of WWT's proposal provides that:

> It is understood that DISA's confirmation herein of the essential need for the equipment/software and DISA's commitment to pursue the continued appropriation of funds is not to exceed one year duration.  However, DISA shall not be obligated to continue performance during the full 72 month period if, pursuant to FAR 52.232-19, funding is not appropriated and is therefore unavailable. DISA intends to use its very best efforts to annually obtain funds to support the service and at this time does not have any knowledge of any event that would prevent the continued need for such service throughout the term.

AR at 16,618.  ViON contends that the proposal's statement that "DISA intends to use its very best efforts to annually obtain funds to support the service" improperly restricts the agency's termination rights under FAR 49.502(b)(1), in violation of the RFP.  Pl. Mem. at 33-34.  In this regard, ViON argues that this Court has held that similar language can restrict the government's termination and option-exercise rights.  Pl. Mem. at 33-34 (citing *Northrop Grumman Computing Sys. v. United States*, 93 Fed. Cl. 144, 149 (2010) (holding that use of "shall use its . . . best efforts" language can restrict agency's ability to terminate or refuse to exercise options); *Mun. Leasing Corp. v. United States*, 1 Cl. Ct. 771, 774-75 (1983)).

But, a plain reading of the language upon which ViON relies shows that WWT's proposal does not restrict the government's right to terminate or refuse to extend the ESS II contract.  In fact, ViON does not identify any language in WWT's proposal that requires that DISA take specific action regarding securing funding or extending performance under the contract.  AR at 16,618.  And so, ViON has not demonstrated that WWT's proposal fails to

conform to the indefinite-delivery/indefinite-quantity terms of the RFP.  *See Centech Grp.*, 554 F.3d at 1038.[13]

### 4.    ViON Has Not Demonstrated The Existence Of An Organizational Conflict Of Interest

ViON's argument that DISA failed to properly evaluate a potential organizational conflict of interest regarding WWT's proposal is equally flawed.  Pl. Mem. at 19.  In its motion, ViON contends that an organizational conflict of interest arose because the Evaluator Group has a strong financial relationship with HP–WWT's primary subcontractor for the ESS II contract.  Pl. Mem. at 19 (citing AR at 18,664; 18,764-84).  Specifically, ViON alleges that Randy Kerns– an employee and cofounder of the Evaluator Group–conducted a training at DISA that "may very well have" resulted in bias.  Pl. Mem. at 35.  Furthermore, ViON states that Mr. Kerns recommended HP products on the Evaluator Group's website.  Pl. Mem. at 19-20 (citing AR at 18,786-89).  And so, ViON contends that the Evaluator Group's work with HP may have affected the contract award process, by influencing DISA's expectations.  Pl. Mem. at 35; *see* AR at 18,759.

With respect to organizational conflicts of interest, the United States Court of Appeals for the Federal Circuit has held that the FAR only obligates an agency to conduct an organizational conflict of interest analysis for significant conflicts, and that contracting officers are given broad discretion in determining whether the potential conflict of interest is significant.  *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) (holding that agencies are only required to document "significant potential conflicts"); FAR 9.504(a)(2).  In this regard, "[a] significant potential conflict is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders."  *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1386 (Fed. Cir. 2011) (quoting *PAI Corp.*, 614 F.3d at 1352).  Moreover, under the FAR, an organizational conflict of interest is present when, "because of other activities or relationships with other persons, a person

---

[13] In its cross-motion, the government argues that the RFP terms that ViON alleges have been violated here are not material.  Def. Rep. at 13.  Because the Court finds that WWT's proposal complies with all of the RFP terms identified by ViON, the Court need not reach the question of materiality.

is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage."  FAR 2.101 (2015).  And so, the FAR obligates the contracting officer to "analyze planned acquisitions in order to . . . [a]void, neutralize, or mitigate *significant* potential conflicts before contract award."  FAR 9.504(a)(2) (2015) (emphasis added).

ViON's allegation of a potential organizational conflict of interest is not substantiated by the administrative record.  In fact, the administrative record shows that the alleged connection between the Evaluator Group and the ESS II contract is tenuous at best.  ViON provides no evidence to show that Mr. Kerns or the Evaluator Group had any impact on the procurement process for the ESS II contract.  To the contrary, in an affidavit proffered by Scott Whitten, DISA's technical evaluation lead for the procurement, Mr. Whitten states that "DISA did not use Randy Kerns or Evaluator Group as a consultant for any consultation or training of DISA personnel in support of the ESS II procurement process."  AR at 18,174.

Furthermore, ViON provides no "hard facts" to indicate that the Evaluator Group influenced the ESS II contract procurement.  *PAI Corp.*, 614 F.3d at 1352 ("[A] protester must identify 'hard facts'; a mere inference or suspicion of an actual or apparent conflict is not enough.");  FAR 9.504(a)(2).  Rather, ViON simply concludes that "[g]iven the Evaluator Group's IT storage expertise and consulting contract with DISA, it was certainly in a position to affect the procurement's ground rules and/or evaluations."  Pl. Reply at 26.  Such a claim is mere speculation and does not rise to the level of "creat[ing] an advantage to one bidder over the others."  *PAI Corp.*, 614 F.3d at 1351.  And so, ViON has not shown that any "significant potential conflicts" existed in connection with the evaluation of WWT's proposal.  *PAI Corp.*, 614 F.3d at 1352;  FAR 9.504(a)(2).

### 5.       ViON Is Not Entitled To Injunctive Relief

Finally, ViON has not demonstrated that it is entitled to the injunctive relief.  To evaluate a right to injunctive relief, the Court must consider (1) whether plaintiff has succeeded on the merits of the case; (2) whether plaintiff will suffer irreparable harm if the Court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.  *PGBA,*

*LLC*, 389 F.3d at 1228-29; *see also Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983).

First, as established above, ViON has failed to succeed on the merits of this protest.  *See PGBA, LLC*, 389 F.3d at 1228-29.  ViON has not demonstrated that DISA acted arbitrarily and capriciously in conducting its evaluation of WWT's proposed technical solution.  Nor has ViON shown that DISA failed to conduct a price realism analysis.  ViON also fails to show that WWT's proposal took exception to any material terms of the RFP.  Finally, ViON has not shown that DISA failed to investigate a potential significant organizational conflict of interest.

Second, ViON has failed to demonstrate irreparable harm.  This Court has long recognized that meritless allegations that a bidding process has been conducted unfairly are "not sufficient to demonstrate an irreparable injury," because, if they were, "any bid protest would involve an irreparable injury."  *OAO Corp. v. United States*, 49 Fed. Cl. 478, 480 (2001).  Because none of ViON's challenges to DISA's award decision are supported by the administrative record, ViON has not demonstrated an irreparable injury in this case.  *Id.*

Third, ViON has not demonstrated that the balance of hardship favors injunctive relief.  In this case, the government would be harmed by a permanent injunction, because DISA would be forced to retain ViON as the incumbent contractor at a significant increase in cost.  AR at 17,386.  Additionally, WWT would be significantly harmed, because it would not be able to perform on the ESS II contract as planned.  And so, the balance harms weigh against granting injunctive relief in this case.  *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 320 (2009) (The Court must balance the harm plaintiff would suffer without injunctive relief against the harm that injunctive relief would inflict on defendant and on defendant-intervenor.).

Finally, ViON has not shown that it is in the public interest to grant injunctive relief in this case.  "Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid."  *PGBA, LLC*, 57 Fed. Cl. at 663 (2003).  But, here, DISA's award decision was reasonable and in accordance with the RFP and applicable law.  The administrative record also shows that there is a rational basis for the agency's conclusion that awarding the ESS II contract to WWT constitutes the best value to the government.  AR at 17,287; 17,387.  The public has "a long-term interest in ensuring that the new contract represents the best overall value to the government."

31

*Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 716 (2006).  And so, the public interests supports the denial of ViON's request for a permanent injunction.

## V.    CONCLUSION

In sum, the extensive administrative record in this case shows that DISA acted reasonably and in accordance with applicable law in awarding the ESS II contract to WWT.  DISA carefully evaluated WWT's proposal during several rounds of technical evaluations and testing to ensure compliance with the RFP.  The agency also appropriately evaluated WWT's proposed price and ensured that WWT's proposal meet the requirements of the RFP.

ViON has not shown by a preponderance of the evidence that DISA's actions were either without a rational basis, or in violation of applicable law.  Indeed, while ViON may disagree with DISA's findings regarding the merits of WWT's proposal, there is no basis for the Court to disturb the agency's reasonable award decision.

And so, for the foregoing reasons:

1.    Plaintiff's motion for judgment on the administrative record is **DENIED**;

2.    Defendant's motion for judgment on the administrative record is **GRANTED;**

3.    Defendant-intervenor's motion for judgment on the administrative record is **GRANTED;** and

4.    Plaintiff's motion to supplement the administrative record is **DENIED**.

Judgment shall be entered accordingly.

Each party shall bear their own costs.

Some of the information contained in this Memorandum Opinion and Order may be considered protected information subject to the protective order entered in this matter on April 9, 2015.  This Memorandum Opinion and Order shall therefore be filed under seal.  The parties shall review the Memorandum Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the protective order prior to publication.

The Court hereby **ORDERS** the parties to **FILE**, by **Tuesday, August 11, 2015**, a joint status report identifying the information, if any, that they contend should be redacted, together with an explanation of the basis for each proposed redaction.

     **IT IS SO ORDERED**.


                 s/ Lydia Kay Griggsby
                LYDIA KAY GRIGGSBY
                Judge